MATTHEW B. MOCK (SBN 316380)
matthew.mock@afslaw.com
OSCAR A. FIGUEROA (SBN 313238)
oscar.figueroa@afslaw.com
**ARENTFOX SCHIFF LLP**
555 S. Flower St., 43rd Floor
Los Angeles, CA 90071
Tel: 213.629.7400/Fax: 213.629.7401

JONATHAN JUDGE (*Pro Hac Vice*)
jonathan.judge@afslaw.com
**ARENTFOX SCHIFF LLP**
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Tel: 312.258.5500/Fax:312.629.5600

Attorneys for Defendant, Counterclaimant and Third-Party Plaintiff
ZHUHAI DINGFU PHASE I INDUSTRIAL ENERGY CONSERVATION INVESTMENT FUND, LP

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

JULIE CHENG a.k.a. JULIE XINGZHOU CHENG a.k.a. XINGZHOU CHENG, an individual,

Plaintiff,

v.

ZHUHAI DINGFU PHASE I INDUSTRIAL ENERGY CONSERVATION INVESTMENT FUND, LP, a Chinese limited partnership,

Defendant.

ZHUHAI DINGFU PHASE I INDUSTRIAL ENERGY CONSERVATION INVESTMENT FUND, LP, a Chinese limited partnership,

Counterclaimant,

v.

JULIE CHENG a.k.a. JULIE XINGZHOU CHENG a.k.a. XINGZHOU CHENG, an individual

Counterclaim-Defendant.

**Case No. 8:25-cv-01553-MRA-JDE**
**[Related Case No. 8:23-cv-02059-MRA-JDE]**

**ZHUHAI DINGFU PHASE I INDUSTRIAL ENERGY CONSERVATION INVESTMENT FUND, LP'S FIRST AMENDED THIRD-PARTY COMPLAINT**

**(1) California Uniform Voidable Transfer Act: Actual Intent to Hinder or Delay Collection;**

**(2) California Uniform Voidable Transfer Act: Constructive Intent to Evade Collection;**

**(3) Quiet Title**

**(4) California Penal Code § 496(c)**

**(5) Civil Conspiracy**

| | |
|---|---|
| ZHUHAI DINGFU PHASE I INDUSTRIAL ENERGY CONSERVATION INVESTMENT FUND, LP, a Chinese limited partnership,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>PHILLIP LIANG ZHANG, an individual; CENTRAL IRVINE INVESTMENT, LLC, a California limited liability company; WILLIAM CHENG, in his capacity as Trustee of the Phillip Zhang and Julie Cheng Family Trust ("Trustee"); and JCAE GROUP, INC., a California corporation,<br><br>Third-Party Defendants. | **Honorable Mónica Ramírez Almadani**<br><br>**Ctrm: 6A**<br><br>**REQUEST FOR JURY TRIAL** |

## INTRODUCTORY STATEMENT

Defendant, Counterclaimant, and Third-Party Plaintiff ZHUHAI DINGFU PHASE I INDUSTRIAL ENERGY CONSERVATION INVESTMENT FUND, LP, ("Dingfu") hereby asserts third-party claims against: Phillip Liang Zhang ("Zhang"); Central Irvine Investment, LLC ("Central Irvine"); William Cheng, in his capacity as Trustee of the Phillip Zhang and Julie Cheng Family Trust ("William Cheng"); and JCAE Group, Inc. ("JCAE") (collectively with Counter-claim Defendant Julie Cheng ("Cheng"), the "Zhang/Cheng Enterprise").

The Zhang/Cheng Enterprise is a single business enterprise, and an alter ego of Zhang. In the related action of *Zhuhai Dingfu Phase I Industrial Energy Conservation Investment Fund, LP v. Phillip Zhang*, No. 8:23-cv-02059-MRA-JDE (the "Enforcement Action"), this Court has recognized and enforced a foreign arbitral award under the New York Convention, and entered an Amended Judgment of $4,798,002.90, plus interest accruing daily, against Zhang.

Discovery in the Enforcement Action has shown that Zhang and Cheng, and the Zhang/Cheng Enterprise, have a net worth that far exceeds the judgment amount, but are engaged in a scheme to evade the enforcement of the Court's Amended Judgment. Zhang and Cheng, and the entities that they control and direct, have transferred assets between and among their various entities to frustrate Dingfu's collection efforts by illegitimately diminishing Zhang's assets and moving them into Cheng's possession or entities controlled by Zhang and Cheng. Cheng then claims, falsely, that all marital property is her separate property, and that Zhang has no assets of his own.

This debt-evasion scheme is not a sophisticated one, and Zhang and Cheng's conduct bears nearly every one of the signature elements of a voidable transfer under the California Uniform Voidable Transfer Act. The Zhang/Cheng Enterprise, and the defendants named herein, have unjustly enriched themselves by using this diverted property to fund their businesses, receiving millions at Dingfu's expense. Zhang and

Cheng's conduct have given rise to the liability of the Third-Party Defendants under California's "single enterprise" alter ego doctrine.

Dingfu seeks to have the judgment enforced, including against the Zhang/Cheng Enterprise, and for the Court to enter an order voiding the unlawful transfers that were intended to avoid enforcement.

**THIRD-PARTY CLAIMS**

1. Defendant, Counterclaimant, and Third-Party Plaintiff Zhuhai Dingfu Phase I Industrial Energy Conservation Investment Fund, LP ("Dingfu") hereby alleges the following for its third-party claims against Third-Party Defendants Phillip Liang Zhang ("Zhang"); Central Irvine Investment, LLC ("Central Irvine"); JCAE Group, Inc. ("JCAE"); and William Cheng, as Trustee of the Phillip Zhang and Julie Cheng Family Trust ("William Cheng") (Zhang, Central Irvine, JCAE, and William Cheng, are collectively referred to as "Third-Party Defendants").

**PARTIES, JURISDICTION AND VENUE**

2. Defendant, Counterclaimant, and Third-Party Plaintiff Zhuhai Dingfu Phase I Industrial Energy Conservation Investment Fund, LP is a Chinese investment fund that entered into an investment agreement with Phillip Zhang and certain Chinese corporations that he controlled.

3. Third-party Defendant Phillip Liang Zhang the Respondent in the related Enforcement Action. He is the CEO and 100% owner of third-party defendant JCAE Group, Inc. He resides in this judicial district. Cheng is Zhang's spouse, holder of community property, is the CFO of third-party defendant JCAE Group, Inc.

4. Third-party Defendant Central Irvine Investment, LLC is ostensibly the California limited liability company managed by Cheng that conducts real estate investment business. In reality, Zhang and Cheng have unlawfully transferred assets into Central Irvine to shield them from enforcement.

5. Third-party defendant JCAE Group, Inc. is registered as a California corporation. In reality, it is a shell that is owned solely by Zhang, and has only two

employees — Zhang and Cheng, who is its CFO. It is undercapitalized, operated out of their home as a sole proprietorship, and owns no significant assets. JCAE is another enforcement evasion device into which Zhang and Cheng transfer funds at will between Cheng, Zhang, Central Irvine Investments, and The Phillip Zhang and the Julie Cheng Family Trust ("Trust") without observing corporate formalities. JCAE's books and records, and in particular, the documentation of so-called "loans" between the various Zhang and Cheng entities, have been fabricated and falsified.

6. Third-party Defendant William Cheng is a California resident and Cheng's 87-year-old father. He is in poor health, is unable to speak English, and was abruptly (and allegedly) installed as Trustee of the Trust in January 2025, at the time this Court granted Dingfu's Motion to Enforce in the Enforcement Action. Cheng and Zhang's appointment of him as Trustee, and their contemporaneous transfer of millions of dollars of Orange County real estate into his control, was done with the intent to hinder and delay Dingfu's enforcement of its judgment. Zhang and Cheng have used the Trust as their own piggy bank, frequently "loaning" themselves large amounts from its assets without recourse or commercially reasonable terms, without repaying these loans or properly documenting them. The Trust's assets are frequently and routinely commingled or otherwise treated as assets of JCAE, Cheng, Zhang, and/or Central Irvine. William Cheng is named solely in his capacity as Trustee.

7. This Court has subject-matter jurisdiction over these claims pursuant to Federal Rule of Civil Procedure 14 and pursuant to diversity jurisdiction, because Dingfu is a citizen of a foreign country and all other parties are citizens of California.

8. The amount in controversy exceeds $5 million.

9. The Court has personal jurisdiction over the Third-Party defendants because all of them reside and/or do business in this judicial district.

10. Venue is proper in this judicial district because a substantial portion of the events giving rise to this cause of action occurred in this judicial district, because all defendants reside and do business in this judicial district, and because a substantial

part of the property that is the subject of this action is situated in this judicial district.

## FACTS COMMON TO ALL COUNTS

## I. DEBTS NOT PAID AND A SINGLE ENTERPRISE OF EVASION.

### A. The Underlying Debt and Siphoning of Repayment from China

11. In 2016, Zhang, Dingfu, and other parties not relevant here entered into the Capital Increase Agreement and Shareholders' Agreement, whereby Dingfu agreed to invest RMB 20 million in Zhang's company Q-Capital.

12. Thereafter, Dingfu paid Q-Capital RMB 20 million pursuant to the Agreements, fully satisfying its investment obligations.

13. At then-prevailing exchange rates, Dingfu's investment in Zhang's company amounted to about $3 million in United States dollars.

14. During this same time, Zhang and Cheng completed improvements on their property at 22762 Channel View property in Laguna Niguel, which would become their residence, and paid off their large construction loan to Wells Fargo, a loan that had been outstanding since 2014.

15. Q-Capital then failed to perform under the relevant agreements, triggering Zhang and Q-Capital's obligation to buy out Dingfu's investment, the so-called equity repurchase obligation.

16. The parties then negotiated an amendment to the original agreements, entering into the Supplementary Agreement I and II. In those supplementary agreements, Zhang essentially received a payment plan.

17. Zhang and his company Q-Capital agreed to repay the RMB 20 million investment in three installments through 2020.

18. Zhang promised to pay for the remaining installments if Q-Capital did not, but in reality did not intend to make those payments. Instead, Dingfu learned facts in the Enforcement Action demonstrating that Zhang intended to return to the United States with his wife and take his gains from the Dingfu transaction with him, to fund his and Cheng's investments and businesses here.

19. The initial installment of 3 million RMB (about USD$435,000) was paid. But Zhang and the entities he controlled failed to pay the remaining installments of RMB 17 million. At then-prevailing exchange rates, the 17 million RMB that Zhang refused to pay back to Dingfu was worth approximately $2.5 million US dollars. Zhang wrongfully withheld the RMB 17 million he had promised to pay to Dingfu.

20. In or about the same time that Zhang failed to make the required payments to Dingfu, Zhang and Cheng purchased a residential real estate property at 145 Linda Vista, Irvine, California, for approximately $1.265 million. On information and belief, at least a portion of the purchase price consisted of the funds that Zhang unlawfully withheld from Dingfu.

21. Zhang and Cheng purchased the 145 Linda Vista property as "community property with right of survivorship."

22. Zhang and Cheng made significant improvements to the 145 Linda Vista property, later describing it as "highly upgraded." On information and belief, at least a portion of the cost of the improvements consisted of the funds that Zhang took from Dingfu under false pretenses. Zhang and Cheng then listed it for rent in July 2020 for approximately $5,000/month.

23. Despite multiple requests from Dingfu, Cheng and Zhang have failed to produce any records showing any source of funds used to purchase the 145 Linda Vista property.

24. When Cheng and Zhang purchased the 145 Linda Vista property, they reported income on their federal tax returns that was insufficient to account for their living expenses and for the purchase of the new property.

25. In October 2024, while Dingfu's Petition to Recognize and Enforce was fully briefed and awaiting ruling, Zhang and Cheng sold 145 Linda Vista for $2,450,000. The funds realized from the sale are not reflected in any bank accounts held by Zhang.

26. Shortly after failing to make the third installment payment required under the Supplementary Agreements, Zhang and Cheng purchased a unit at the Grand Monarch resort in Dana Point, California, for over $1.5 million. On information and belief, at least a portion of the purchase consisted of the funds that Zhang unlawfully withheld from Dingfu.

27. Despite multiple requests from Dingfu, Cheng and Zhang have failed to produce any records showing any other source of funds used to purchase the Grand Monarch property.

28. Shortly after failing to make the third installment payment required under the Supplementary Agreements, Zhang and Cheng purchased a property at 191 Pin Lane, Lake Forest, CA. On information and belief, at least a portion of the purchase consisted of the funds that Zhang unlawfully withheld from Dingfu.

29. Thereafter Zhang and Cheng quickly “flipped” and re-sold the 191 Pin Lane property, realizing a substantial profit from the funds unlawfully retained from Dingfu.

### B. <u>Zhang And Cheng Fabricated and Falsely Backdated Financial Records</u>

30. In the Enforcement Action, Zhang produced records in discovery that purported to show loans made between the Trust and JCAE Group, which purportedly served as capital contributions to JCAE. The records were signed by and offered by both Zhang and Cheng in an attempt to show legitimate transfers of money for a valid business purpose. Specifically, Zhang and Cheng testified that these large payments were merely “loans” made by Cheng or the Trust to Zhang and/or JCAE Group.

31. But Zhang fabricated these records and then repeatedly lied about it, under oath, in his debtor examination. He also lied about backdating the records, in some cases by years, with the obvious intent to make them appear as though they had been created before the Zhang Action began. In reality, as discovery has shown, the

records were first created over a year after the Zhang Action began.

32. On April 10, 2025, Zhang fabricated at least three loan agreements that purported to document transfers of hundreds of thousands of dollars between JCAE Group and the Trust. Both Zhang and Cheng signed these fabricated and backdated documents.

33. Zhang also created false "Capital Contribution" documents that purported to document these loans and other transfers as though they were legitimate capital contributions made by him to JCAE.

34. In discovery in the Zhang Action, JCAE was ordered by the Court, twice, to produce the original Loan Documents and the Capital Contribution documents in native form. JCAE disobeyed the first order, issued on April 17, 2025. Petitioner was forced to move to compel a second time, and the Court again reiterated its order on November 6, 2025.

35. When those records were produced, they revealed that all three Loan Documents had been created by Zhang on April 10, 2025, and all were created within 7 minutes, between 11:17 and 11:24 AM.

36. Zhang falsely dated the Loan Documents to August 27, 2020; May 31, 2024; and September 23, 2024.

37. On the date that Zhang created the false Loan Documents, Dingfu had served discovery on Zhang, Cheng, and JCAE Group seeking all documents related to transfers of monies between and among those entities. Dingfu's motion to compel that discovery from JCAE Group was pending before the Court, with a hearing on that motion set for a week later, on April 17, 2025. Thus, when they falsified the Loan Documents, Zhang and Cheng (as the CEO and CFO of JCAE) knew that they would likely be required to produce them in discovery.

38. On April 17, 2025, the Court granted Dingfu's motion to compel and ordered that the Loan Documents and the Capital Contribution documents be produced. JCAE produced false documents on April 24, 2025. But JCAE produced

only PDF versions; not the native versions, which would have revealed their date of creation and thus their falsity.

39. Cheng signed each of the three Loan Documents on behalf of the Trust. Zhang signed each of the three Loan Documents on behalf of JCAE.

40. In his July 18, 2025 Debtor Examination, Zhang repeatedly lied, testifying that each of the Loan Agreements were created and signed on the date they were dated.

41. For example, he testified falsely under oath that the Loan Agreement dated May 31, 2024 was actually signed on May 31, 2024:

Q. And so that the record is clear, your testimony is that this document, page 050 and 051 of Exhibit 9, was signed, because it had been printed out already, on May 31st, 2024; is that right?

A. **Correct. I don't believe otherwise.**

42. He likewise testified, falsely, that the Loan Agreement dated September 23, 2024 was actually signed on September 23, 2024:

Q. Was this Loan Agreement printed and signed on September 23rd, 2024? By you?

A. **Yes.**

43. Zhang's lies were knowing and intentional, because he knew he had first created all three Loan Agreements on April 10, 2025, just three months before he gave this testimony.

44. Cheng, as JCAE's Chief Financial Officer and the signatory of the Loan Documents on behalf of the Trust, knew that the Loan Documents were created on April 10, 2025, and knew that she had not signed the Loan Documents on the days they were dated.

45. When Julie Cheng signed the three Loan Documents on or after April 10, 2025, she was no longer the Trustee of the Trust, having ceded that role to William Cheng in January 2025. Accordingly, on April 10, 2025, as a matter of law,

Julie Cheng lacked the authority to enter into any loan agreement on behalf of the Trust, and all three Loan Documents are void, and therefore sham and fraudulent in nature.

46. Moreover, Julie Cheng's actions in signing Loan Documents and holding herself out as Trustee, when she knew she was not a Trustee, demonstrate that the appointment of William Cheng as Trustee was a sham, and that in reality, through the present, Julie Cheng and Philip Zhang retain all control over the Trust.

47. For his part, Zhang knew, when he signed the Loan Documents on or after April 10, 2025, that Julie Cheng was not a Trustee and thus could not approve or enter into Loans on behalf of the Trust.

48. For these numerous reasons, both Zhang and Cheng acted knowingly and intentionally to falsely fabricate financial transactions when they signed the three Loan Documents on or after April 10, 2025.

49. There were no loans; the transactions were entirely fabricated. No one—not Zhang, Cheng, the Trust, or JCAE—has produced any financial records that would support or corroborate the existence of any legitimate loan transactions.

50. Zhang and Cheng fabricated these Loan Documents and lied about them for the purpose of concealing and withholding monies from Petitioner through false pretenses, to wit, by using these false documents to support their fraudulent arguments, made to the Court and to Dingfu, that the monies held by the Trust were Cheng's separate property and could not be enforced against by Petitioner.

51. Zhang and Cheng's fabrications and lies sought to withhold and conceal through false pretenses the funds that they had earlier misappropriated from Petitioner.

52. Zhang's and Cheng's fabrications and lies are binding on themselves and the entities they represented or purported to represent: JCAE Group and the Trust.

53. During his same July 18, 2025, debtor examination, Zhang also admitted

that he created and falsely backdated capital contribution statements. He admitted that those documents did not exist before the Zhang Action. Zhang created them only after Dingfu served discovery requests in the Zhang litigation in early 2025:

> Q. Now, the rest of the Capital Contribution Statements that are reflected in Exhibit 8, and that is through -- Bates 058 through 062, these were all created by you in or about the time that you received our document requests in this litigation; is that right?
>
> A. **Yes.**

54. Zhang testified that he used records and information held by Ms. Cheng, JCAE's CFO, to create the records in 2025.

55. Zhang then falsely backdated them to 2021 and 2024, including falsifying the dates on which they were supposedly signed, to make it appear as though they were created and signed at the time of the supposed earlier capital contributions. He admitted this:

> Q. It was backdated?
>
> A. **Okay. Yeah.**
>
> Q. And that's true of every Capital Contribution Statement that is shown here in Exhibit 8; correct?
>
> A. **Correct.**

56. Even more telling, Zhang then admitted that JCAE's financial books and records — which are the province of the company's CFO, Cheng — did not show that JCAE received any capital contribution in 2021, the date when the falsified and backdated documents purportedly showed a very large loan from Cheng for a capital contribution.

57. While that case was pending before this Court, Cheng supposedly made several additional loans, totaling an even larger amount, to Zhang, again to be used as capital contributions to JCAE Group. But JCAE's books and records showed contributions of only about one-fifth the amount shown on the Capital Contribution

Statements, a major discrepancy that Zhang could not explain.

**C. The Trust is an Alter Ego for Cheng and Zhang and is Part of the Single Zhang/Cheng Enterprise**

58. The Trust was created in 2012 as a revocable trust, with Cheng and Zhang as the Settlors and Trustees.

59. Zhang and Cheng claim to have converted the Trust into an irrevocable trust in 2019 ("Restated Irrevocable Trust"), the same year that Zhang wrongfully withheld the funds from Dingfu and the same year that Zhang and Cheng bought the 145 Linda Vista property. It is well settled that a trust created for the purpose of defrauding creditors is illegal and may be disregarded.

60. There is considerable doubt as to whether Cheng and Zheng actually converted the Trust into the Restated Irrevocable Trust. Cheng and Zhang refused to produce any trust-related documentation created before enforcement efforts began in 2025 to support that assertion and continue to withhold electronically stored information and other materials bearing upon that issue.

61. The 2019 amendments claimed to have occurred by the Trust reflect several irregularities that likely precluded the Trust from becoming truly irrevocable. These irregularities include, but are not limited to:

a. Phillip Zhang is listed as a beneficiary but was also the original settlor of much of the property that is now claimed to be part of an irrevocable trust. In California, when a beneficiary of trust was also a settlor of its property, any spendthrift or other restraint on the transfer of property from the trust is invalid. CAL. PROB. CODE § 15304.

b. Julie Cheng retained for herself, a settlor, the power to direct the disposition of property within the 2019 amendments. (Section 1.05). An irrevocable trust must completely cede control to dispose of property. By retaining this power, Julie Cheng

foreclosed, as settlor, the ability of the 2019 amendments to effectuate irrevocability.

62. In a 2020 filing with Wells Fargo to obtain a bank loan, Zhang and Cheng expressly referred to the Trust as "revocable" in nature.

63. The Trust never filed tax returns until the 2024 tax year, i.e., after the Enforcement Action was commenced.

64. Until the 2024 tax year, all income and other financial information regarding the Trust was reported on Zhang and Cheng's personal joint tax return.

65. On information and belief, the Trust did not obtain a taxpayer identification number until after the Enforcement Action was commenced.

66. At all times relevant herein, Zhang and Cheng dominated and controlled all decisions of the Trust.

67. Cheng claims to have made numerous "loans" from the Trust to Zhang and to JCAE. But as described above, documents regarding several of these loans have been fabricated and falsely backdated to make them appear legitimate. In reality, these are not loans but simple cash transfers and commingling of assets between Cheng, Zhang, JCAE, Central Irvine, and the Trust.

68. The vast majority of these loans have not been documented or have not been sufficiently documented.

69. For example, Julie Cheng made at least 65 "loans" from the Trust to herself between 2022 and 2024 alone. These loans are not documented with promissory notes or any other similar written instrument, evidencing a debt or an obligation to repay it. Only a single (purported) payment has been made to pay back the Trust for the "loans" it made.

70. According to the (suspect) documentation, many of the loans were made to pay the mortgage or property taxes at the 145 Linda Vista property, showing commingling of Trust assets with Zhang and Cheng's personal assets (the Linda Vista Property was deeded to Zhang and Cheng as joint community property).

71. Even then, there are no electronic records of these loans; the only evidence of their existence is a one-line handwritten entry in a ledger.

72. Until January 2025, only Zhang and Cheng were involved in making decisions for the Trust. This included deciding what assets and real estate to acquire, what investments to make with the Trust's assets, when and on what terms to loan money to Cheng, when and on what terms to loan money to Zhang, and when and on what terms to loan money to JCAE Group.

73. In January 2025, at or about the time Judgment was entered in the Enforcement Action, Cheng and Zhang allegedly and abruptly resigned as Trustees of the Trust and made the decision to install Cheng's father, William Cheng, as Trustee. William Cheng is 87 years old and in poor health.

74. During her third-party debtor examination, Julie Cheng claimed that the substitution of William Cheng as Trustee was required by the terms of the irrevocable restatement of the Trust. However, this statement is false: the provisions of the irrevocable restatement of the Trust produced by William Cheng during post-judgment discovery contain no such requirement.

75. The designation of William Cheng as the new Trustee was a sham and intended to delay and hinder Dingfu's collection efforts.

### D. JCAE Group Inc. ("JCAE") is an Alter Ego for Cheng and Zhang and is Part of the Single Zhang/Cheng Business Enterprise

76. For at least the last five years, JCAE has been merely a shell. It has ceased to observe corporate formalities, has commingled assets with Cheng, Zhang, and the Trust, has had essentially no income, and has suffered net operating losses every year.

77. For at least the last five years, JCAE has had only two employees: Phillip Zhang and Julie Cheng. In JCAE's mandatory filings with the California Secretary of State, Zhang is identified as the President and CEO; Cheng is identified as the Chief Financial Officer.

78. JCAE has failed to observe corporate formalities.

79. JCAE is listed as a California corporation, but Zhang testified under oath that JCAE has never issued any shares or stock.

80. Zhang claims to be the sole shareholder and 100% owner of JCAE but he testified under oath that he possesses no stock or shares in JCAE.

81. JCAE does not hold any annual or shareholder meetings and has not held any such meetings in at least the last five years.

82. Other than the required annual filing with the California Secretary of State, JCAE has not issued any annual reports or financial reports in the last five years.

83. JCAE ceased to have any physical offices at least five years ago. The business operates out of Zhang and Cheng's residence address at 27762 Channel View, Laguna Niguel, CA.

84. However, JCAE falsely lists its existing business address as 4512 Campus Drive, Irvine, CA, on purported loan documents and in its filings with the California Secretary of State.

85. JCAE's financial records are maintained by Julie Cheng on her personal laptop computer, along with Zhang and Cheng's personal financial records and, on information and belief, those of Central Irvine and the Trust – all the records of the Zhang/Cheng Enterprise.

86. JCAE is dramatically undercapitalized. JCAE's two bank accounts show almost no holdings.

87. If Zhang's and Cheng's statements are credited as true, JCAE owes vast amounts of money to the Trust and to Julie Cheng; in reality, however, these were not loans at all but were transfers of money from the Trust to Zhang.

88. JCAE's financial records and actual financial holdings have unexplained inconsistencies. For example, Cheng, Zhang, and the Trust have produced documents that purport to show loans to JCAE, but the loans are not

reflected in JCAE's books, and JCAE's bank accounts likewise do not show transactions or holdings that match the purported loans.

89. Zhang has admitted to fabricating numerous JCAE financial records for purposes of responding to discovery in the Enforcement Action. These fabricated records include supposed "Capital Contribution Statements," which pertain to supposed loans from both Julie Cheng and the Trust to JCAE, and they did not exist before Dingfu's post-judgment discovery was served.

90. For at least the last five years, JCAE has not operated as a corporation under California law; rather Zhang and Cheng have treated it as a device to evade their debts and debt collection efforts, and part of their broader scheme to concentrate all purported liabilities with Zhang or entities superficially held by him, while concentrating all assets with the Trust, Cheng, or entities superficially held by her.

91. In reality, JCAE is part of a single enterprise that consists of Zhang, Cheng, Central Irvine, the Trust, and JCAE.

**E. <u>Central Irvine Investments is an Alter Ego for Cheng and Zhang and is Part of the Single Zhang/Cheng Business Enterprise</u>**

92. Ostensibly, Central Irvine Investments LLC, ("Central Irvine") is a real estate investment business to purchase and hold commercial and residential real estate investments. In reality, Central Irvine is a shell and merely part of the Zhang/Cheng enterprise.

93. Central Irvine does not file its own tax returns; rather its income is reported on Zhang's and Cheng's personal joint tax return.

94. Income for the properties held by Central Irvine was reported as joint income to Zhang and Cheng on their personal tax returns.

95. All decisions are made by Cheng and Zhang; there are no other members or managers of the LLC.

96. On information and belief, Zhang and Cheng have commingled Central Irvine's assets with those of their personal property and the property and assets

nominally held by the Trust.

97. Despite numerous requests from Dingfu, Zhang and Cheng have been unable to produce documentation showing that the assets of Central Irvine are maintained separately from those of Zhang, Cheng, or the Trust.

## II. ALTER EGO AND SINGLE BUSINESS ENTERPRISE LIABILITY

98. Zhang and Cheng are the de facto owners and managers of JCAE, Central Irvine, and the Trust. They control all operations of each of these entities and use these entities to pool and commingle their assets. Rather than observe organizational formalities, they disregard them entirely, as alleged herein, including by routinely and repeatedly transferring money back and forth between the three entities.

99. Cheng is sophisticated in financial matters, holding a degree in Accounting from the University of Minnesota.

100. JCAE has—and for five years has had—only two employees, officers, directors, and managing agents: Zhang (CEO) and Cheng (CFO). It has only one putative shareholder and owner, Zhang. All decisions about this corporation are made by Zhang and/or Cheng.

101. As to the Trust, from the time it was formed in 2012 until January 2025, when Cheng's 87-year-old father was installed as a sham at the time the Judgment was entered, Zhang and Cheng have controlled all of its assets. They have made all decisions about payments into and out of the Trust.

102. Zhang and Cheng have repeatedly made sham "loans" from the Trust to themselves and to JCAE. These loans are not documented with a promissory note; do not accrue interest, and the borrowing entity or individual does not pay them back.

103. The Trust assets are routinely commingled with non-Trust assets, used to pay non-Trust expenses and expenses for the spouse's community property, like the dozens of loans Cheng made to herself to pay for the mortgage on the couple's jointly owned investment property at 145 Linda Vista, Irvine.

104. Large loans were routinely made from Cheng to Zhang, supposedly for investment into JCAE; from the Trust to JCAE, and from the Trust to Zhang.

105. Central Irvine is entirely controlled by Cheng and Zhang. They make decisions together regarding which properties to acquire.

106. In October 2014, Zhang gave Cheng a special power of attorney for matters pertaining to commercial properties held by Central Irvine, including 16380 Bake Parkway, Irvine and 16390 Bake Parkway, Irvine. If Zhang was not an owner and/or controller of Central Irvine, there would have been no reason for him to grant Cheng this power of attorney.

107. As alleged above and herein, there exists such a unity of interest and ownership between the Trust, Central Irvine, and JCAE that their separate personalities are merged, so that each entity and/or corporation is a mere adjunct of the others. The various entities in effect form a single enterprise controlled entirely by Zhang and Cheng. This unity of interest and ownership is indicated by, but not limited to:

- The commingling of funds and assets between the Third-Party Defendants.
- The Third-Party Defendants treat each other's assets as their own, but not their liabilities.
- The Third-Party Defendants have operated from the same physical location at all relevant times.
- The sole employees or representatives of the Third-Party Defendants have been Zhang, Cheng, or their family members.
- Inadequate capitalization and insolvency.
- Failure to follow organizational formalities, including, but not limited to, issuing required shares of stock, holding shareholder / annual meetings, issuing required reports, maintaining separate records, properly accounting for financial transactions, obtaining

loans on commercially reasonable terms, and operating themselves in their own best interests or the best interests of their beneficiaries as opposed to the interests of other Third-Party Defendants.

- The Third-Party Defendants have a unity of financial interest: maximizing their collective assets and minimizing recourse for creditors of Zhang and Cheng.

108. Allowing the individual actions of JCAE, the Trust, or Central Irvine to be treated as individual actions rather than that of a single enterprise would produce an inequitable result.

109. Allowing the Trust, which is irrevocable in name only, to hold itself out as irrevocable would produce an inequitable result.

110. Zhang, Cheng, the Trust, Central Irvine, and JCAE operate as a single entity and are the alter egos of Zhang and Cheng and should be treated as such. The Court should order collection and enforcement against all their assets, however held, because they are properly considered to be jointly and severally liable for them.

## III. RELEVANT INDICIA UNDER THE CALIFORNIA UNIFORM VOIDABLE TRANSACTION ACT AND ALTER EGO LIABILITY

111. Cheng's and Zhang's conduct, as alleged herein, displays numerous indicia relevant under California alter ego and the California Uniform Voidable Transfer Act ("CUVTA"). These include, but are not limited to:

112. Dozens or hundreds of self-serving transactions to insiders, including using Trust assets to make dozens of purported "loans" to themselves, which such loans were instead naked cash transfers. Cal. Civ. Code, § 3439.04(b)(1).

113. Retaining possession and control of all assets purportedly held in "irrevocable trust," including both cash or equivalents and real estate assets, and making all decisions regarding use, investment or disposition of those assets. Cal. Civ. Code, § 3439.04(b)(2).

114. Fabricating evidence of sham transactions. Cal. Civ. Code, § 3439.04(b)(3).

115. Concealing such transactions by carrying them out through the Trust or Central Irvine. Cal. Civ. Code, § 3439.04(b)(3).

116. These transactions (including the supposed creation of irrevocable trusts, the real estate transactions, and the other transactions identified herein, among others yet to be revealed in discovery), all occurred after the debtor realized that he could not pay back debts to Dingfu. Cal. Civ. Code, § 3439.04(b)(4).

117. The cumulative effect of the transactions was to transfer all of Zhang's assets to Cheng, the Trust, and Central Irvine. Cal. Civ. Code, § 3439.04(b)(5).

118. Zhang and Cheng both absconded from China to the United States shortly after Dingfu began proceedings to sue Zhang and collect what he owed. Cal. Civ. Code, § 3439.04(b)(6).

119. Zhang and Cheng removed and concealed numerous assets, including the sale of Zhang's property in China; the sale of the 145 Linda Vista property, the sale of the 191 Pin Lane property, and then transferred and concealed the sale proceeds to other accounts. Cal. Civ. Code, § 3439.04(b)(7).

120. The Third-Party Defendants received no reasonably equivalent value for their shares of the funds and properties transferred, because Cheng and Zhang falsely and without support claimed that all the transactions involved only her separate property. This includes receiving nothing of value in return from the Family Trust. Cal. Civ. Code, § 3439.04(b)(7) and (8).

121. Cheng and Zhang believed or reasonably should have believed that Zhang was incurring and would incur debts beyond his ability to pay as they became due. Cal. Civ. Code, § 3439.04(b)(9).

122. Zhang claims to be insolvent or nearly insolvent. Cal. Civ. Code, § 3439.04(b)(9).

**COUNT I – CALIFORNIA UNIFORM VOIDABLE TRANSFER ACT: ACTUAL INTENT TO HINDER OR DELAY COLLECTION**

*(Against All Third-Party Defendants)*

123. Dingfu incorporates the allegations made in the preceding paragraphs as if they were set forth fully herein.

124. Cheng and the Third-Party Defendants transferred property with the intent to hinder, delay, or defraud Dingfu, making it more difficult for Dingfu to collect monies that it was owed.

125. These transfers include:

- Purchasing 145 Linda Vista, Irvine;
- Selling 145 Linda Vista, Irvine;
- Dispersing the proceeds from the sale of 145 Linda Vista to evade collection efforts;
- Purchasing a unit in the Monarch Bay resort, Dana Point;
- Purchasing 191 Pin Lane, Lake Forest, CA;
- Selling 191 Pin Lane, Lake Forest, CA; and
- Dispersing the proceeds from the sale of 191 Pin Lane to evade collection efforts.
- Attempting to convert the Trust, and thereby its claimed assets, into an irrevocable trust.

126. Zhang incurred debts to Dingfu with the intent of hindering, delaying, or defrauding Dingfu, making it more difficult for Dingfu to collect payment.

127. The conduct described above was a substantial factor in causing and continuing to cause financial harm to Dingfu.

128. Some of the Third-Party Defendants produced evidence of their individual holdings, financial structures, and financial transactions to Dingfu within the past calendar year in response to post-judgment discovery in the Enforcement Action.

129. This information had not previously been provided to Dingfu.

**COUNT II – CALIFORNIA UNIFORM VOIDABLE TRANSFER ACT: CONSTRUCTIVE INTENT TO EVADE COLLECTION**

*(Against All Third-Party Defendants)*

130. Dingfu incorporates the allegations made in the preceding paragraphs as if they were set forth fully herein.

131. As alleged above, Dingfu received an Amended Judgment in its favor and against Zhang.

132. Zhang has not satisfied the Amended Judgment against him in favor of Dingfu, creating a rebuttable presumption of insolvency. Cal. Civ. Code, § 3439.02(b).

133. The value of Zhang's debts has been greater than the amount of his assets for several years.

134. Cheng and the Third-Party Defendants transferred real and personal property between themselves and others, without receiving reasonably equivalent value in exchange.

135. These transfers include:

- Purchasing 145 Linda Vista, Irvine;
- Selling 145 Linda Vista, Irvine;
- Dispersing the proceeds from the sale of 145 Linda Vista to evade collection efforts;
- Purchasing a unit in the Monarch Bay resort, Dana Point;
- Purchasing 191 Pin Lane, Lake Forest, CA;
- Selling 191 Pin Lane, Lake Forest, CA; and
- Dispersing the proceeds from the sale of 191 Pin Lane to evade collection efforts.
- Attempting to convert the Trust, and thereby its claimed assets, into an irrevocable trust.

136. Zhang incurred his debts to Dingfu while intending, believing, or when he reasonably should have believed that he would not be able to pay them back when due.

137. The conduct described above was a substantial factor in causing and continuing to cause financial harm to Dingfu.

**COUNT III – VERIFIED CLAIM TO QUIET TITLE – CCP § 760.020**

*(Against All Third-Party Defendants)*

138. Dingfu incorporates the allegations made in the preceding paragraphs as if they were set forth fully herein.

**Purchase of Properties Transferred to the Trust**

139. On or about November 26, 2008, Phillip Zhang and Julie Cheng purchased, as joint tenants, real estate at the address of 33657 Mill Pond Drive, Wildomar, California (the "Mill Pond Drive Property"). Upon information and belief, legal description of the Mill Pond Drive Property is:

> THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF WILDOMAR, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:
>
> PARCEL 1:
>
> LOT 57 OF TRACT NO. 23445-2 IN THE CITY OF WILDOMAR, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 358, PAGES 61 THROUGH 65, INCLUSIVE, OF MAPS, AND AS SHOWN IN CERTIFICATE OF CORRECTION RECORDED MAY 21, 2015 AS INSTRUMENT NO. 2015-211827, OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA. ALSO EXCEPTING ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND ALL MINERALS AND/OR CHEMICAL ELEMENTS LYING BELOW A DEPTH OF FIVE HUNDRED (500) FEET FROM THE SURFACE OF THE REAL

PROPERTY, BUT WITHOUT THE RIGHT OF ENTRY UPON ANY PORTION OF THE SURFACE THEREOF FOR THE PURPOSE OF EXPLORING FOR, BORING, EXTRACTING, DRILLING, MINING, PROSPECTING FOR, REMOVING OR MARKETING SAID SUBSTANCES.

PARCEL 2: NONEXCLUSIVE EASEMENTS FOR ACCESS, INGRESS, EGRESS, USE, ENJOYMENT, UTILITIES, ENCROACHMENT, SUPPORT, MAINTENANCE, REPAIRS AND FOR OTHER PURPOSES, ALL AS DESCRIBED IN THE DECLARATION, DECLARATION OF ANNEXATION AND SUPPLEMENTARY DECLARATION.

140. On or about October 6, 2009, Phillip Zhang and Julie Cheng purchased, as joint tenants, real estate at the address of 22762 Channel View, Laguna Niguel, CA 92677 (the "Channel View Property"). Upon information and belief, the legal description of the Channel View Property is:

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LAGUNA NIGUEL, COUNTY OF ORANGE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

LOT 74 OF TRACT 12041, IN THE CITY OF LAGUNA NIGUEL, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 533, PAGE(S) 33 TO 41 INCLUSIVE OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND AS AMENDED BY CERTIFICATE OF CORRECTION RECORDED FEBRUARY 28, 1986 AS INSTRUMENT NO. 86-081225 OF OFFICIAL RECORDS.

141. On or about August 30, 2012, Phillip Zhang and Julie Cheng jointly transferred the Channel View Property to the Revocable Trust by deed.

142. On or about August 30, 2012, Phillip Zhang and Julie Cheng jointly transferred the Mill Pond Drive Property to the Revocable Trust by deed.

143. On or about August 30, 2013, Phillip Zhang and Julie Cheng purchased, as joint tenants, real estate at the address of 15 Daystar, Irvine, CA, 92612 (the "Daystar Property"). The legal description of the Daystar Property is believed to be:

> THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF IRVINE, COUNTY OF ORANGE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:
>
> PARCEL 1:
>
> LOT 13 OF TRACT NO. 14861, IN THE CITY OF IRVINE, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 706, PAGES 32 AND 34, INCLUSIVE OF MISCELLANEOUS MAPS, IN
> THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY EXCEPTING THEREFROM, ALL OIL RIGHT, MINERAL RIGHTS, NATURAL GAS RIGHTS AND RIGHT TO ALL OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN, TO ALL GEOTHERMAL HEAT AND TO ALL PRODUCTS DERIVED FROM ANY OF THE FOREGOING (COLLECTIVELY, "SUBSURFACE RESOURCES"), AND THE PERPETUAL RIGHT TO DRILL, MINE, EXPLORE AND OPERATE FOR AND TO PRODUCE, STORE AND REMOVE ANY OF THE SUBSURFACE RESOURCES ON OR FROM THE PROPERTIES, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN THE PROPERTIES, WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE PROPERTIES, AND TO BOTTOM SUCH

WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS WITHIN OR BEYOND THE EXTERIOR LIMITS OF THE PROPERTIES, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE AMY SUCH WELLS OR MINES, BUT WITHOUT THE RIGHT TO DRILL, MINE, EXPLORE, OPERATE, PRODUCE, STORE OR REMOVE ANY OF THE SUBSURFACE RESOURCES THROUGH OR IN THE SURFACE OR THE UPPER FIVE HUNDRED FIFTY FEET (550') OF THE SUBSURFACE OF THE PROPERTIES.

PARCEL 2: NON-EXCLUSIVE EASEMENTS FOR ACCESS, INGRESS, EGRESS, DRAINAGE, MAINTENANCE, REPAIRS AND FOR OTHER PURPOSES, ALL AS DESCRIBED IN THE DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND RESERVATION OF EASEMENTS FOR CONCORDIA WEST RECORDED MAY 27, 1994 AS INSTRUMENT NO. 94-0366034 OF OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA.

144. On or about October 10, 2013, Phillip Zhang and Julie Cheng jointly transferred the Mill Pond Drive Property to the Revocable Trust by deed.

**Partial Transmutation of Property**

145. On August 6, 2014, Phillip Zhang and Julie Cheng allegedly executed a Property Asset Allocation Agreement that purports to transmute and divide real, and personal property previously acquired by them during their marriage.

146. According to Julie Cheng, the Property Asset Allocation Agreement awarded her sole ownership of the Mill Pond Drive Property, the Channel View Property, and the Daystar Property.

147. Under Section 852(b) of the California Family Code, transmutation agreements are ineffective against third-party creditors as to real property unless the transmutation was publicly recorded.

148. The Property Asset Allocation Agreement was never publicly recorded but rather was kept private between Phillip Zhang and Julie Cheng.

149. Defendant Dingfu is a third-party creditor of Phillip Zhang.

150. Accordingly, the Property Asset Allocation Agreement is void in its attempt to reclassify the Mill Pond Drive Property, the Channel View Property, and the Daystar Property as separate property of Julie Cheng.

**Alleged Partial Conversion of the Trust**

151. In 2019, the then-revocable Trust was allegedly restated to become the Restated Irrevocable Trust.

152. Phillip and Julie were named joint trustees of the Restated Irrevocable Trust. However, the Restated Irrevocable Trust states that the sole "Settlor" of the Restated Irrevocable Trust is Julie, and only property interests owned by her could therefore have been converted to the ownership of the Restated Irrevocable Trust.

153. By Declaration dated July 2, 2025, Julie confirmed under oath that she "restated my portion of the 2012 Living Trust as an Irrevocable Trust."

**Phillip's Remaining Portion of the Trust**

154. Because only Julie's "portion of the 2012 Living Trust" was restated, Phillip's still-revocable portion of the Trust was therefore not restated as an irrevocable trust.

155. Under California law, transfer of a property held in joint tenancy to another party severs the joint tenancy, resulting in a tenancy in common.

156. Properties transferred into revocable trusts retain an underlying status to which they would revert upon revocation. By transferring the Mill Pond Drive Property, the Channel View Property, and the Daystar Property to the Trust, those

properties necessarily became properties held jointly by Julie and Phillip as tenants in common through the then-revocable Trust.

157. Because the Property Asset Allocation Agreement was void as to Dingfu, as a third-party creditor, the Mill Pond Drive Property, the Channel View Property, and the Daystar Property were not transmuted into Julie's separate property, and her attempt to transfer those properties to the Restated Irrevocable Trust was void and ineffective. Rather, those properties remain in possession of what remains of the (revocable) Trust.

158. In the alternative, even if Julie's attempt to transfer those properties was effective as to her undivided one-half interest in those properties, it was ineffective as to Phillip's undivided one-half interest in those same properties, because Julie was the sole defined Settlor of the Restated Irrevocable Trust, and only Julie's then-existing property interests could have been contributed to it.

159. According to California Probate Code Section 18200, property inside a revocable trust may be accessed by the creditors of a debtor the same as if it were in the debtor's own possession.

160. Regardless of whether Phillip's portion of the (revocable) Trust continues to exist and thereby continues to hold his interests in the above-described properties, or whether that Trust has entirely terminated, reverting Phillip's interests in those properties to Phillip individually, the above-referenced properties belong to Phillip and/or his portion of the Trust in some capacity to be determined by the court.

**<u>Disputed Title to the Properties</u>**

161. The Restated Irrevocable Trust contends that it is the sole owner of the Mill Pond Drive Property, the Channel View Property, and the Daystar Property, and this interest is adverse to the interests of Third-Party Plaintiff Dingfu, as creditor of Phillip Zhang.

162. Third-Party Plaintiff Dingfu contends that the entirety or some portion of each of the Mill Pond Drive Property, the Channel View Property, and the Daystar

Property are in fact still held by Phillip Zhang or what remains of the original revocable Trust.

**<u>Quiet Title</u>**

163. The Mill Pond Drive Property, the Channel View Property, and the Daystar Property are all located within the Central District of California.

164. Dingfu is filing its Abstract of Judgment with the Clerk-Recorder Department of Orange County, placing an automatic lien on properties associated with Phillip Zhang in that county, including the Daystar Property and the Channel View Property.

165. Dingfu is filing its Abstract of Judgment with the Clerk-Recorder Department of Riverside County, including the Mill Pond Drive Property.

166. As a party with liens on these three properties, Third-Party Plaintiff Dingfu has an interest in lifting the cloud that exists over proper titling of these properties and seeks a determination of proper title to the Mill Pond Drive Property, the Channel View Property, and the Daystar Property.

167. Dingfu has only learned of this cloud over the title of these properties within the last calendar year.

168. This Court should quiet title to these properties in Phillip Zhang and/or the previous revocable Trust.

**<u>COUNT IV –THEFT BY WITHHOLDING AND CONCEALMENT THROUGH FALSE PRETENSES</u>**

**<u>CALIFORNIA PENAL CODE SECTION 496(c)</u>**

*(Against Philip Zhang, JCAE Group, Central Irvine, and William Cheng as Trustee)*

169. Dingfu incorporates the allegations made in the preceding paragraphs as if they were set forth fully herein.

170. California Penal Code section 496(a) provides that "[e]very person who … receives any property that has been stolen or that has been obtained in any

manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170 […].”

171. Penal Code section 496(c) provides a private cause of action for a violation of Section 496(a). It states: “Any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney’s fees.”

172. Zhang knowingly and intentionally retained, concealed and withheld some or all of the RMB 17 million he promised to repay to Dingfu in a manner constituting theft, by: (i) intentionally falsely promising Dingfu he would repay those amounts, while having no present intention to fulfill those promises; (ii) transferring some or all of those monies to accounts held by Zhang, Cheng, JCAE, Central Irvine or the Trust, in an attempt to conceal or withhold them from Dingfu; (iii) falsely withholding it and concealing all or some of those monies through financial fraud and fraud on the Court, including but not limited to the false and fabricated Loan Documents and Capital Contribution documents, by Zhang and Cheng’s perjury in their July 2025 examinations, and by other false pretenses.

173. Dingfu has been injured by Defendants’ unlawful conduct.

**<u>COUNT V – CIVIL CONSPIRACY</u>**

*(Pleaded in the Alternative Against Philip Zhang, JCAE Group, Central Irvine, and William Cheng as Trustee)*

174. Dingfu incorporates the allegations made in the preceding paragraphs as if they were set forth fully herein.

175. As alleged above, Zhang, Cheng, JCAE Group, The Trust, and Central Irvine are all part of a *de facto* single enterprise that does business as a single entity.

176. In the alternative, to the extent that any of these persons or entities are deemed not to be part of the Zhang/Cheng Enterprise, then these entities and persons have unlawfully agreed and conspired with each other and Zhang, Cheng, JCAE Group, The Trust, and Central Irvine to:

a. Conceal, and withhold stolen property, as alleged herein;

b. Violate the California Uniform Voidable Transaction Act, as alleged herein;

c. Defraud Dingfu and the Court by fabricating false financial records and committing perjury regarding those same records, as alleged above;

177. The co-conspirators have undertaken numerous overt acts in furtherance of the conspiracy, including but not limited to fabricating numerous false financial records and committing perjury regarding those financial records, as alleged above.

178. Dingfu has been damaged as a result of the conspiracy and defendants' unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Dingfu respectfully prays for judgment, jointly and severally, against Third-Party Defendants Phillip Liang Zhang; William Cheng as Trustee of the Phillip Zhang and Julie Cheng Family Trust; Central Irvine Investment LLC; and JCAE Group Inc.; and asks the Court to award the following relief:

1. Compensatory damages sufficient to make Dingfu whole for all of Cheng's and Third-Party Defendants' unlawful actions;
2. Treble damages pursuant to Penal Code Section 496(c);
3. Punitive damages for Defendants' fraud, oppression and malice;
4. Dingfu's reasonable attorney's fees pursuant to Penal Code Section 496(c);
5. An order declaring the transactions identified in Paragraphs 104(a) through (h) void under the UVTA and directing turnover of those

amounts and assets to Dingfu, as well as all property of the Trust or its predecessors in interest;

6. An order directing a judicial sale of the assets of Central Irvine Investment and JCAE Group Inc., as necessary, to satisfy the judgment;

7. An order attaching the accounts receivable of JCAE Group, Inc. and Central Irvine Investment LLC;

8. Appointment of a receiver, the third-party defendants' expense, to ensure the efficient and orderly collection of funds and assets sufficient to fulfill the foregoing orders;

9. An order quieting title in Third-Party Defendant Phillip Zhang or the revocable remnant of the Trust with all or the appropriate portions of the Mill Pond Drive Property, the Channel View Property, and the Daystar Property, either solely or as tenant in common, as the Court determines to be required by law and equity;

10. Prejudgment and post-judgment interest at the maximum legal rate;

11. Costs; and

12. For such other and further relief as the Court deems just and proper.

**REQUEST FOR JURY TRIAL**

Dingfu requests a trial by jury of all issues so triable.

Dated: November 21, 2025

**ARENTFOX SCHIFF LLP**

By: */s/ Matthew B. Mock*

Matthew B. Mock
Jonathan Judge
Oscar A. Figueroa
Attorneys for Defendant, Counterclaimant, and Third-Party Plaintiff
ZHUHAI DINGFU PHASE I INDUSTRIAL ENERGY CONSERVATION INVESTMENT FUND, LP

## VERIFICATION

I am an attorney for Defendant and Third-Party Plaintiff Dingfu in this action. I have read Count III of the foregoing *First Amended Third-Party Complaint* and it is true of my own knowledge, except as to those matters stated on information or belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Chicago, Illinois on November 21, 2025.

Jonathan Judge